Good morning, your honors. My name is Colleen Cassidy, and I represent Michael Hagood on the street stop and frisk of Michael Hagood as he stood outside a NYCHA housing project in the Bronx, talking to two friends after midnight. The court upheld the seizure as justified on four factors. One, Hagood wore a thick leather fanny pack across his chest, which Officer Migliaccio considered nontraditional, but which was a common style, as they acknowledged. Two, the police drove by, and in the no more than two to three seconds in which they could observe him, established a a line or ridge that could potentially, in his words, have been the slide of a gun. Third, when the police car approached Hagood shining its lights, Hagood looked nervous like a deer in the headlights. And four, the neighborhood, the site of a large NYCHA housing complex, had a lot of crime and gang violence. This is the sum total of the facts justifying the police stop and frisk of Michael Hagood. There was no report of any crime or suspicious conduct. These facts could not provide reasonable suspicion, either individually or in totality. Not one of these factors provides any basis for suspicion. Nothing plus nothing equals nothing. The most significant factor that the court relied on was Migliaccio's claim, which was first made at the hearing and departed from his justification in the complaint in the grand jury. That he could prove that he was guilty of a crime. He could discern through the thick leather fanny pack an elongated line or ridge. There are two insurmountable problems with this factor. First, the observation was impossible in the circumstances. He was driving by Hagood from a distance of 30 feet in the dark, and the video showed that because of the parked cars blocking his view, he had no more than two or three seconds to observe Hagood. And this is while he was driving. He was the driver. He could not have discerned any... Right. Exactly. That's what he said he could discern in that amount of time. Why is two to three seconds not enough time to discern that there's a line that looks like the side of a gun? Because he was also 30 feet away. He didn't even see Hagood when he was abreast of him because he was blocked by an SUV. He only saw him when he was coming down the road. And we put the video in. It's in the appendix, and I urge the court to view it if you haven't already. It shows really how impossible this would have been to see anything through the pack. Also, the photo of the fanny pack is in evidence at A39, and the fanny pack open with the gun inside is at A41, and it shows how small the gun was compared to the fanny pack so that it wouldn't have been the kind of thing that would really protrude. Sergeant Cunahan, who was first to reach and grab Hagood, never saw... What other things, assuming, you say it couldn't have been seen, but assuming that something was seen, what other things did people normally carry would also have given the same sight? Exactly, Your Honor. That's the second problem, the second insurmountable problem, is that even if Hagood had been able to discern a line, a line is on any rectangular object. Cell phones, number one, probably the most commonly held item in a fanny pack. A wallet, an eyeglass case, the Warby Parker eyeglass case is a long, rigid line. Cigarettes. Even in this case, there were two packs of Newport hard pack box cigarettes. Anything that was going to make a line could have made a line. Well, he used to only have reasonable suspicion that there's a crime occurring, right? So if there's something that's consistent with a gun, but also other objects, why wouldn't that still be reasonable suspicion? Because it can't be just total speculation. Especially if he's saying, based on my expertise, I think likely it's a gun in this context, and I saw an object that could be a gun. Okay, so getting, if I could get to the expertise then. The court, in order to bolster, the court had trouble with Migliaccio's credibility, as expressed on the record, because partly because of the physical circumstances, but also partly because this story had been sprung at the hearing and was not in the prior submissions on the justification or prior testimony. Well, isn't that why Judge Engelmeyer satisfied himself with the fanny pack, you know, looking at it, that it was in fact discernible? Well, that was exactly, there were three facts that the court relied on in order to find Migliaccio could have seen this and did see this line. One was that the court found that Migliaccio knew how firearms looked in fanny packs based on his five Terry stops. But Migliaccio's actual testimony was that he made five Terry stops and had found no guns in the fanny packs. So that it was the opposite of what the district court said it was relying on. Exactly. It was the opposite. So that if nothing else, the district court's statement about that was erroneous. It was. It was clearly erroneous. Second, the court found that Cunahan saw a bulge. When Cunahan repeatedly testified that he saw no shape or bulge, even though he was the one who got right up close to Haggard and grabbed him. That's at A207 to 208. And finally, there was the fact that the court itself, as Judge Park mentioned, had donned the fanny pack itself. Pulled it tight and looked down a few inches onto its own chest and said that it could see a line. Under conditions that bore no similarity to Migliaccio's observations. The court struck on its chest in court, but at the time it made no contention. So you said that there was nothing in your opening statement. But now you're suggesting it's just not credible that he saw the line. So I guess I just want to separate out these two things. So if, in fact, he saw a line in the fanny pack, would that be reasonable suspicion? No, it would not, because the line- So even if everything they say is true, and it was visible, and there was a visible line, you still think it's not reasonable suspicion? Yes, exactly. I have an additional question. Even assuming the possibility that there was a gun, that that might be a gun, why is that suspicion to search? People have a right to have guns. You know, we have the Second Amendment. Now, it's hard in New York because there are any number of reasons why people may not be allowed to. But the notion that because somebody who has no other reason to think is guilty of anything might have something, which might be a wallet, might be a cell phone, might conceivably be a gun, that that's reason to search. Exactly, Your Honor. That would be no reason. Exactly? Didn't Judge Calabresi answer his own question? Again, I mean, if it's really hard to have a license to carry a gun lawfully in New York City, then isn't the fact that somebody's walking around with it reasonable suspicion to think maybe they're holding it illegally and the officer can at least check? Well, actually, we briefed this case before Bruin, but if Your Honors would like a briefing on that, we could submit additional- But how do you think Bruin changes things? Well, it- Right, but it does say that- So if the officers see somebody with a gun and they think it might not be licensed or it might not be legally carried, don't they have reasonable suspicion to think that there's a crime occurring? Perhaps, but they can't operate on the assumption that it's so difficult to have a license that nobody could have one, which was the understanding that they're operating on. What we have to have, I think, is some indication that this is somebody who we think doesn't have a right to have a license, and that may be, and if it is somebody who has a criminal history or other things or that you know something about, but you know, I just worry about if I'm walking around in New York and a policeman sees something that says he may be carrying a gun, that the person has the right to stop me. Exactly, and even aside from Bruin, a situation where someone's doing nothing except hanging outside a residential building, talking to friends at night, no crime has been reported whatsoever, but an officer notices that he's carrying something, either a pack or a fanny pack or a backpack, and says, you know, I see something that I think could possibly be a gun. The ambiguity about the possibilities, but you're agreeing with Judge Calabresi that just having a gun is not reasonable suspicion. So is your position that even if Mr. Haygood was just holding a gun in his hand and it was totally visible and everybody saw it, the officers would not have reasonable suspicion to think a crime was occurring? No. So if they could in fact see that he was holding a gun, you agree that that's reasonable suspicion? Well, they would certainly have reasonable suspicion to approach him, but that's not our argument. We're not making that argument based on Bruin. We're making an argument as the law existed at the time, and at the time, the three factors that the officers relied on that were particular, at all particular to Haygood, were not sufficient. The line through the pack, the crossbody style, which Michelangelo never testified that this was in any way associated with criminality. He couldn't say that. All he said was, well, I assume you wear a fanny pack, you wear it around the waist, but he acknowledged that he had seen many people wearing crossbody fanny packs. In fact, it was the raging style, as the articles that are in my brief show, well before this arrest. And they had to admit that. Well, they said that it wasn't, that it became a style, but it wasn't at the time. Well, the only officer who testified to that was Rios. One of the officers, and Rios communicated none of his observations or views to Migliaccio, and it was Migliaccio who testified that his own observations and his own inferences were the complete, the total world of information that he had when he decided to make this arrest. And Migliaccio testified that he had seen men, women, and teenagers wearing packs this way on the streets of the Bronx before the arrest. Cunningham did too, for what it's worth. He didn't communicate either. But in any event, if somebody is wearing something that is in a different style, why does that give rise to a right to serve? It does not, Your Honor. Exactly. I may be wearing sneakers on my head instead of a hat, and that's not stylish. And it's possible that a sneaker in my head could have a gun in it, which my hat would not, but so what? Exactly, Your Honor. That's the point. Even if this had been uncommon, which it was not, as the testimony established, there was no articulation by Migliaccio as to how this was relevant to whether it contained a gun or not. What I have here is the fact that ex post it turned out to be right. Exactly, and that can't be the answer. Well, maybe. And that's what Judge Engelmeyer said. He said the problem is, the biggest concern in my mind is that a gun was found. So that our basic problem is with the exclusion. Right. But just to that point, it's worth noting that the police did also search the two friends who were with Haglund, and they had no guns. So they were only correct one out of three. They found no guns, and they didn't even take their names or give them a ticket or anything. Yeah, but we are in a position, because of the exclusionary rule, that when we find this, we know that somebody has committed a crime, and because of the exclusionary rule, we are asked to let the person go. That's correct, Your Honor. That is the law. And that's what's moving us in many of these cases to do something which, if there weren't an exclusionary rule, we'd all say was absurd. Yes, Your Honor. And that's my, you know, but the exclusionary rule is big. That's it. Thank you. You're preserved a couple minutes, Killer Bob. Thank you. We'll hear from the government. May it please the court. My name is Mitzi Steiner. I represent the United States in this appeal, as I did in the proceeding before the district court. The district court did not err, much less clearly err, in making factual findings following a full two-day suppression hearing, which formed a strong basis for the court's decision. reasonable suspicion to justify a Terry stop of Mr. Haygood. Judge Engelmeyer appropriately concluded that the three NYPD officers on the scene who testified before him at length were each credible on several critical points. First, the arresting officer, Officer Migliaccio, observed what opposing counsel has just referred to as the elongated, rigid, solid object with a line that was hard at the top and that he believed was consistent with the shape of a firearm. He said that he had a certain amount of time, and yet a video showed he was lying. Your Honor. I don't know. We have a Supreme Court telling us that where a video shows something, the testimony is not to be accepted. Your Honor, Judge Engelmeyer had the benefit of that video that was introduced by defense counsel. So did we. And that is exactly what the Supreme Court in Scott has held, that we can look at a video, and if we conclude that that video shows no more than a certain amount of time, the district court can be ignored, and what the person said. Your Honor, respectfully, the district court evaluated that video evidence and actually concluded that it corroborated the officer's testimony in several regards. For example, the pace at which they had approached Mr. Haygood, the subsequent altercation with Mr. Haygood, and he was able to weigh any minor inconsistencies with the officer's testimony. A minor inconsistency is a minor inconsistency. The difference between three seconds of seeing something and a much longer time is hardly minor when you're talking about what you can see. I mean, you know, of course a minor inconsistency, but I got a problem. Your Honor. Well, the district court determined that three seconds was enough time, right? Yes. That's correct, Your Honor, and really at bottom, this is a credibility assessment as to whether or not Officer Migliaccio saw what he said he saw. And after subjecting Officer Migliaccio- May I ask you on the credibility assessment, the district court did say that Officer Migliaccio had a good experience at stopping people and finding guns, but that was incorrect, no? Your Honor, I would disagree as to that point. The court had an extended colloquy with Officer Migliaccio to clarify that point. That's at A193 to 194, and ultimately concluded after that discussion with Officer Migliaccio while he was sworn in on the stand that he had, in fact, recovered firearms from 10 to 15 fanny packs during the course of his vast experience in that immediate area. Where is it in the record that he had done so? He said he tried five times and didn't find any. Were those Terry stops? Your Honor, the 10 to 15 recoveries of firearms from fanny packs were in Terry stops and also car searches that ultimately resulted in the seizure of a firearm. So the Fourth Amendment- That was a different situation. Well, the Fourth Amendment, Your Honor, would be equally implicated in both circumstances. And I think what's significant here is not only did Officer Migliaccio testify to his particular experience encountering firearms in fanny packs, he also testified credibly that he had received NYPD intel that firearms were being held in fanny packs by suspects in the immediate vicinity in which he was patrolling, and he also testified that he would check NYPD intel on a daily basis- Let me go back to what I said before about having guns. Of course, if somebody has a gun and you can see it, even though they may have it legally, that may well be a reason to do a search or something because they may have it illegally. But let's say that in New York, it's about a 50% chance that you have it legally or not. That's your starting point. Then you have to take the chance that it really was a gun and that they really saw it. That is, what you have to decide is that there is sufficient reason. And it's one thing if you start from 100% that when people have guns it's illegal, but it's very different if you start from a much lower percentage of guns being illegal and then doing all the other things that reduce the thing before we start to say that there was some reasonable ground for stopping somebody. And, you know, I'm just asking whether on those facts somebody like me or you could reasonably be stopped. Well, Judge Calabresi, the reasonable suspicion standard, as this court is well familiar, is a very lenient one. It is far lower than a preponderance standard. And certainly in October of 2020 when this incident took place, there were vast restrictions on possessions of firearms that would have established. So that is the crime that the officer thought that Haygood was committing, possession of a firearm. Correct, Your Honor. The firearm itself is the crime. Illegally possessing the firearm. So you think whatever their suspicion to think that somebody is holding it, that's enough? Your Honor, the assessment for any Terry stock. And remember, I guess just to go to Judge Calabresi's question, I mean, is it the case that if somebody is possessing a gun out on the street, there's a 50-50 chance that it's legal? I don't believe that's the case, Your Honor, that it's a 50-50 chance. And, again, even if that were the case, a reasonable suspicion standard would be lower than, more likely than not. Let's be clear on one thing. We're not talking qualified immunity. Qualified immunity would give the policeman the right to do this if he thought it was. We're talking about whether there is sufficient to do a search, which is a different, it's a slightly different. I mean, qualified immunity is a much tougher standard. To go back to what the officer testified about the fanny packs. So he says, you know, in response to the court saying that you didn't remember a Terry stop in which you had found a gun. He says, I thought you meant that night with Terry stops or whatever. We have made arrests with Terry stops. When I say 10 to 15, there were also fanny packs in cars with firearms and stuff like that, including those in there as well, when he said there were 10 or 15 arrests with guns and fanny packs. So he did testify that he just has experience that people keep guns and fanny packs, right? Your Honor, I would agree that the colloquy was a bit inconsistent at points. And I think for that purpose, Judge Engelmeyer was really trying to drill down on precisely what Officer Migliaccio's testimony was. And again, based on his assessment of the entirety of the evidentiary record, Officer Migliaccio did make several statements about his experience with recovering firearms and fanny packs. And again, the intel that I mentioned, Judge Engelmeyer did conclude that he had experience. So I had this question earlier about whether with Judge Calabresi wears a sneaker on his head, that would be reasonable suspicion. But if you're wearing an article of clothing in a weird way, but it's one that, you know, the officers associated have experience believing that it's something in which people keep guns, would that be a different analysis? Your Honor, it is always a totality of the circumstances analysis. So wearing a sneaker on your head absent more, you know, would not be sufficient. Having a bulge in a place like Your Honor has referred to where one might expect to see a firearm might be a different analysis. Here we have not only the telltale sign of a firearm, we have the nervousness of Mr. Haygood, which- Would any sensible person who has a car going by and stops and does things when the car is not identified not be nervous? I mean, really, let's, for once, let us be honest that what is going on is that the government may properly want research on the basis of hunches, because sometimes the hunches turn out to be true, and we have a rule, the exclusionary rule, which means that when it is true, we have to let out somebody who is guilty. And that that's what's going on, and we should stop making believe that there is probable cause, likely probable cause, something like probable cause, when in fact it's just a hunch, which if we go back to Terry said is not enough. If we could be honest about it and say that's what we want to do, at least we'd be doing something correct. Your Honor, respectfully, as this court has noted in the en banc Weaver opinion, the nervousness of an individual- Of course, everything is relevant. I'm just saying look at this case. Look at this case. Not the others. Not close ones. Well, look at this case. Was the nervousness of Mr. Haygood the same as the nervousness that anybody would have when they see a car approaching? I don't believe so, Your Honor. As Officer Migliaccio testified, Mr. Haygood had a deer-in-the-headlights look. He looked agitated, and he almost jumped at the sight of the officers as they passed by. Could I ask you about something your friend was talking about, that the straight edge, even if visible in the short time, could be consistent with a cell phone or a wallet or a number of things, not just the slide of a gun? Thank you for that question, Judge Park. No. The answer is flatly no. The officers each testified that not only was this an elongated line, but it also was bulky and it was weighty, which would be very different than- You can tell something is weighty in three seconds from a distance of 30 feet. Your Honor, these are officers with their, again, vast experience, years of experience- Which five times in similar situations turn out to be wrong. Their entire professional responsibility is to surveil the streets of New York City and to try and spot firearms from a distance. And here, I just want to direct the court to A93 to 94 in the record, where Officer Migliaccio testified as to the particular firearm that was recovered here, which was a high-point semi-automatic firearm, and he testified that that firearm is unique in that it is weightier, it is heavier than other firearms. It also has more exaggerated features. The slide and the handle are bigger than other firearms that are comparable, and that the slide is not flush, it's not smooth. And that, in many ways, corroborates what Officer Migliaccio observed, in that he saw a weighty, heavy object that had a very clear appearance of a rigid, solid slide at the top. Was the district court right that Haygood was seized right when the officers pulled up in their cars? Your Honor, the government, in its appeal briefing, noted that we believe that reasonable suspicion was established by that point in time and were therefore not questioning the district court's decision on that point. We think it's not relevant in the sense that the government would prevail regardless of whether the seizure stopped at the point at which the officers first observed Mr. Haygood or at the subsequent point where they became closer in proximity to him. Thank you. Thank you. Thank you, Counsel. Counsel, I've been hard on you, but you've done a good job. Thank you, Your Honor. Ms. Castillo, your rebuttal. A few responses. First, my adversary just stated that each officer said that they saw the line or the elongated ridge, and that did not happen. Only Migliaccio saw the line. Who was driving? Rios, who was not driving and could have more time, arguably, to look out the window, saw no line. He said that he saw a bulge at some point. Officer Cunahan, who was the first to reach Haygood, got out of the car and approached him, saw no shape whatsoever, and he said that about five times when questioned, that he saw no shape through the fanny pack. Second, on the nervousness, the court found that Haygood's reaction, being startled and looking surprised, according to Migliaccio, when he saw the police lights flash in his eyes like a deer in the headlights, the court found that this was nervous and evasive conduct. It was certainly not evasive. At the most, it was nervous. Evasive conduct is running, hiding, ducking, pushing down. Those are the kinds of conducts in ward law, in Weaver, and other cases that the courts have found added suspicion. Here, the court found there was no flight at all. I have a different thing. The court said, and no one is arguing, that the fact that the fellow was wearing the colors of a gang was not to be taken into account. The fact that he was wearing blue and that that was the color of a gang was not to be taken into account. I find that interesting because it seemed to me that the only thing that was the reason for the police's hunch was that he was doing something that made them think that he was a member of a gang and therefore everything else followed. But we don't have that. If I were saying, why was it that these police stopped this person, they stopped him because he was wearing something that they thought said he was a member of a gang in their experience. But that gets thrown out. Yes, and it was thrown out for good reason. First of all, they couldn't even testify that it was the colors of the gang that were the main color of the gang that was in that area that said it was the color of a different gang. But the convoluted thinking justification was that maybe he was in the wrong neighborhood looking for trouble with the gang, even though he was standing there talking to his friends. In addition, there was testimony elicited on crosswords the court credited that these gangs were different colors every day, that there was no set gang color, that they changed their colors constantly. So that couldn't be credited. That was the justification. And the original justification that Migliaccio set forth in the complaint and grand jury, it was that he was wearing blue and we were concerned about gangs. When we parked and approached, not that they stopped him, but parked and approached, he ran and bumped into Cunahan who felt the gun. That was the original justification, which completely got thrown out. And Judge Engelmeyer was trying to drill down on that. He was questioning Migliaccio's credibility, saying, this is a striking departure from the scenario that was first put forward, including in the government's papers. And he was really concerned about that. And the only reason he wound up crediting Migliaccio was by bolstering it with these other facts, which were clearly erroneous, the five Terry stops. And if we want to look at what Migliaccio said, it's in the transcript. It's on page 192. The court was questioning him about the Terry stops. How many Terry stops did people with fanny packs? A good amount, around five maybe. Did you ever retrieve a gun from a fanny pack in any of those five? I don't think so. Then later the court questioned him. And I'm trying to understand what you're saying here, because he said he'd been a part of arrests involving 10 to 15 arrests involving fanny packs, whatever that means. Well, it came out in the subsequent cross-examination. Well, we've also made arrests with fanny packs just outside the person in a car, so it's not on the person, it's just a loose fanny pack in a car, which has no bearing on his ability to see how a gun in a fanny pack presents in this situation. It has no bearing on his ability to see the gun in the fanny pack, but if you're asking, as you did before, that just wearing an article of clothing in a strange way isn't enough to establish reasonable suspicion, if he has experience that people keep guns in fanny packs and somebody's wearing a fanny pack in a weird way, then why don't those two things together amount to reasonable suspicion? Well, first of all, he wasn't wearing the fanny pack in a weird way, as he acknowledged many people wore it that way. It was a fashion. And Coney Hunt said it was a fashion. But even if it was a weird way, even if he hadn't seen someone wearing a fanny pack that way before or seen one or two people wearing a fanny pack, there was no association with wearing a fanny pack that way and having a gun. The fact that there had been some arrests of guns in fanny packs in some way, in cars, here and there, doesn't mean that wearing it that particular way had anything to do with fanny packs. There are also guns found in backpacks. And some people wear backpacks on their shoulder and some people wear them on their back. What if the police said, well, I saw you wearing it on your shoulder. If you're carrying a gun, you're going to carry it in some pack of some sort. So it's not surprising. If you look in some packs, you'll find guns. Where are you going to carry it? In your nose? Exactly. The fact that there had been guns found in some fanny packs. If it were a gun holster, if it were a thing designed to carry guns, and he saw him carrying that, that would be reasonable suspicion, right? That would be a different case. So if he has enough experience that he thinks that people generally are using fanny packs as gun holsters, wouldn't it essentially be a gun holster? Maybe you're saying the testimony doesn't support that inference. But it could be that some article of clothing or some container is associated with carrying guns in a way that's like a gun holster, right? It could be, but that never came out. It could be. Well, that's just testimony. Maybe you're saying that his experience of 10 to 15 cases is not enough, but he does say that he's got 10 to 15 terror stops where they found guns in fanny packs. But all that says is that guns had been found in fanny packs. He also testified, and this is all in the record, that he had seen many people wearing fanny packs, including cross-body. Fanny packs were about as common as backpacks in his experience in the Bronx. And that many, many of these people, he had no suspicion whatsoever that they were carrying guns. There was no likelihood that they were carrying guns. So just the fanny pack in itself had no particular association with a gun. And wearing it that way had no particular association with a gun. So this is just using this as a way to speculate that, well, you know, he might have a gun. Could be. There he is. He's standing out there. Let's check it. Let's check it out. Let's go get him. And that's what happened in this case. And he did. He did. And the other two did not, who were also searched. Also, in terms of what Migliaccio testified falsely about, he also testified that there was no double-parked car, going to Judge Calabresi's point earlier, that the video showed that he was just wrong on things, how things happened. He said there was no double-parked car behind the SUV, and the video showed clearly that there was a double-parked car, which was very crucial because that's what interrupted any view of Haggard. They could only see him in the one-and-a-half car lengths between the SUV and the double-parked car behind. So. Thank you. Thank you, counsel. Thank you both. We'll take the case under advisement. Thank you.